# Illinois Official Reports

## Appellate Court

## *In re Al. P.*, 2017 IL App (4th) 170435

| | |
|---|---|
| Appellate Court Caption | *In re* AL. P., AN. P., AS. M., and ST. J., Minors (The People of the State of Illinois, Petitioner-Appellee, v. Angel P., Respondent-Appellant). |
| District & No. | Fourth District<br>Docket No. 4-17-0435 |
| Filed | November 1, 2017 |
| Decision Under Review | Appeal from the Circuit Court of McLean County, No. 16-JA-7; the Hon. Kevin P. Fitzgerald, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Adele M. Saaf, of Bloomington, for appellant.<br><br>Jason Chambers, State's Attorney, of Bloomington (Patrick Delfino, David J. Robinson, and Kathy Shepard, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| Panel | JUSTICE STEIGMANN delivered the judgment of the court, with opinion.<br>Justices Knecht and Holder White concurred in the judgment and opinion. |

**OPINION**

¶ 1 In February 2016, the State filed a petition for adjudication of wardship, alleging that respondent's minor children, St. J. (born April 28, 2003), As. M. (born April 15, 2008), An. P. (born November 25, 2013), and Al. P. (born April 7, 2015) were neglected minors under section 2-3(1)(b) of the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/2-3(1)(b) (West 2016)). In March 2016, the trial court adjudicated all four children neglected.

¶ 2 In December 2016, the State filed a petition to terminate respondent's parental rights to all four children. In February 2017, at the fitness portion of the termination hearing, respondent stipulated that she was an unfit parent.

¶ 3 In May 2017, at the best interest portion of the termination hearing, the parties presented evidence and rested their cases, and the trial court then asked to hear additional evidence from St. J.'s therapist about whether St. J. wanted to be adopted by his foster family. After so requesting, the trial court continued the best interest hearing. When that hearing resumed, the guardian *ad litem* (GAL) presented testimony from the therapist, and the court found that it was in St. J.'s best interest to terminate respondent's parental rights.

¶ 4 Respondent appeals from the judgment terminating her parental rights only as to St. J., arguing that (1) the trial court violated respondent's right to due process by requesting additional evidence at the best interest hearing after the parties had rested their respective cases and (2) the court's decision to terminate respondent's parental rights to St. J. was against the manifest weight of the evidence. We disagree and affirm.

¶ 5                                   I. BACKGROUND
¶ 6                        A. Proceedings on the Neglect Petition
¶ 7 In February 2016, the State filed a petition for adjudication of wardship, alleging that respondent's four minor children were neglected minors under section 2-3(1)(b) of the Juvenile Court Act (705 ILCS 405/2-3(1)(b) (West 2016)). Those four children were St. J., As. M., An. P., and Al. P. Specifically, the State alleged that the minors were living in an environment injurious to their welfare because respondent and the minors' respective fathers had unresolved issues of domestic violence, anger management, and alcohol or substance abuse.

¶ 8 After a February 2016 shelter care hearing, the trial court placed the children in the temporary guardianship of the Illinois Department of Children and Family Services (DCFS). In March 2016, the court conducted an adjudicatory hearing and found all four minors neglected because of respondent's unresolved issues of "alcohol and/or substance abuse." After a June 2016 dispositional hearing, the court adjudicated all four minors wards of the court and placed them in the guardianship of DCFS with authority to place them.

¶ 9                B. Proceedings on the Petition To Terminate Parental Rights
¶ 10 In December 2016, the State filed a petition to terminate respondent's parental rights as to all four minors.

¶ 11                    1. *The February 2017 Fitness Portion of the Termination Hearing*

¶ 12        At the February 2017 fitness portion of the termination hearing, respondent stipulated that she was unfit for failing to make reasonable progress toward the return of her children during the nine-month period from March 22, 2016, to December 22, 2016. The State presented a factual basis, which included an allegation that police responded to incidents involving respondent in June 2016 and December 2016.

¶ 13        The trial court accepted the stipulation and found respondent unfit.

¶ 14                    2. *The Best Interest Portion of the Termination Hearing*

¶ 15        In May 2017, the trial court began the best interest portion of the termination hearing. The court stated that in addition to testimony, the court would consider various reports that had been presented to the court in earlier proceedings, such as police incident summary reports, and the court would also consider a permanency review report and a best interest report.

¶ 16                            a. The Best-Interest Report

¶ 17        The May 2017 best interest report prepared by the court-appointed special advocate (CASA) stated that in June 2016, St. J. was placed with his father, Stephen J., in Texas. Stephen J. later requested that St. J. return to Illinois. In December 2016, St. J. was placed in a foster home in Illinois. St. J. maintained occasional phone contact with Stephen J.

¶ 18        Regarding respondent's service plan, she had failed to do the following: maintain continuous employment, obtain independent housing, avoid domestic violence situations, and maintain sobriety. The best interest report indicated that St. J. felt secure and valued in his foster placement and had formed an attachment with his foster father. St. J. reported feeling at home with his foster family. CASA recommended that it was in St. J.'s best interest to terminate respondent's parental rights.

¶ 19                            b. Other Evidence

¶ 20        Bloomington police officer Benjamin Smith testified that on March 27, 2017, he responded to a report of domestic violence involving respondent and Frederick Childs. When Smith arrived, he could tell that respondent was intoxicated. Respondent told Smith she had consumed some beer and seven shots of vodka. Respondent was living with Childs for a few days and described her relationship with him as "on and off." Childs became upset when respondent received a phone call from an ex-boyfriend. She and Childs began arguing, and Childs punched her twice in the face. Smith arrested respondent after she admitted throwing rocks to break two windows of Childs's apartment.

¶ 21        Todd Smith testified that he was a mental health counselor who provided domestic violence, as well as general, counseling to respondent beginning in June 2016. He performed a domestic violence assessment and determined that respondent required domestic violence treatment. Respondent completed that treatment in January 2017. Respondent told Todd Smith that she was trying to stop drinking alcohol but relapsed in July 2016, October 2016, and March 2017.

¶ 22        Todd Smith testified further that respondent told him about an incident of domestic violence that occurred between Childs and respondent in March 2017. Todd Smith testified

that by throwing rocks through Childs's windows, respondent had not utilized the strategies she learned during domestic violence counseling.

¶ 23 Kendra Helferich testified that she was a DCFS child welfare specialist who worked with respondent, St. J., and Stephen J. She testified that Stephen J. wanted to continue having contact with St. J. In addition, St. J.'s foster parents were supportive of St. J. having ongoing contact with respondent and Stephen J., even if their parental rights to St. J. were terminated. Helferich testified that she believed it was in St. J.'s best interest to maintain contact with respondent and Stephen J., as long as respondent was healthy and doing well. Helferich testified further that she was in favor of terminating respondent's parental rights because St. J. was struggling with the anxiety of the situation being unresolved. According to Helferich, St. J. wanted to live with respondent if respondent was healthy, but St. J. understood that she was not healthy. St. J. was disappointed that respondent had not attended his track meets, to which he had invited her.

¶ 24 Helferich testified further that St. J. had been living with a foster family since December 2016, when he returned from living with his father in Texas. St. J. received a great deal of support from his foster family. He was attending church and participating in extracurricular activities.

¶ 25 Helferich also testified that St. J. would suffer "a lot of anxiety" if respondent's parental rights were not terminated. According to Helferich, respondent still needed to work on her sobriety, her financial situation, and providing a suitable home for her children. Although St. J. was no longer living with his siblings, Helferich thought he was in the best situation possible. He felt loved, cared for, and nurtured with his foster family. Helferich had not talked to St. J. about whether he wanted to be adopted, even though he was at an age when he would need to approve any adoption. His foster parents were unsure whether they could adopt him, so Helferich had not talked to St. J. about the possibility. His foster parents had committed to keeping St. J. in the home permanently, and Helferich believed they would adopt St. J. if respondent's parental rights were terminated. Helferich testified further that St. J. would rather continue living with his foster family than to return to living with Stephen J. However, St. J. and Stephen J. remained in contact.

¶ 26 St. J.'s foster parent, Dean P., testified that the other members of the household were his wife, Melissa; his uncle, Mitchell; and a 15-year-old foster son. Dean and Melissa were planning to adopt the 15 year old. Dean testified that St. J. wanted a good relationship with respondent, but respondent was currently unable to provide that. Dean suggested that St. J. was "parentified," meaning that he wanted to take care of respondent instead of respondent taking care of him.

¶ 27 Dean testified further that St. J. was participating in a church youth group and in track and field and was planning to participate in football. In addition, St. J. was behaving more like a youth, as opposed to when he first moved in, when he worried about things that adults should be worried about. St. J. got along well with Dean's other foster child and referred to him as his "brother." Dean testified that if St. J. were to remain in his care, he intended to offer to adopt him. St. J. had gone camping with the family and travelled with them to West Virginia and Atlanta, Georgia. Dean and Melissa were considering moving to Florida at some point in the future. If St. J. was still in their care when they moved, they wanted to allow St. J. to maintain a relationship with his relatives in Illinois. Based on Dean's conversations with St. J., St. J. wanted to live with respondent but his second choice would be living with Dean and Melissa

permanently. St. J. had moved around a lot recently and did not want to move again. Because St. J. had not lived with Dean long enough for adoption to be an option, Dean had not discussed adoption with St. J. Dean thought that St. J.'s counselor, Todd Smith, had discussed adoption with St. J. Dean testified further that St. J. suffered anxiety surrounding the termination proceedings. In Dean's opinion, St. J. would benefit from having the situation resolved.

¶ 28                              c. The Trial Court's Request for Additional Evidence

¶ 29        After the parties finished presenting evidence, the trial court said the following:

> "I really feel I need to hear something about [St. J.] I'm not sure how I can make a decision if I don't know if he's going to agree to an adoption or not agree to an adoption. *** I think maybe the best way to try to get that evidence in is through the therapist and not ask [St. J.] directly[.] *** I think it's information I need to be able to make the best decision I can for him. *** If they don't have the information, *** then I'll just go on what I've heard. But I would like to have that information before I make the decision."

The court then continued the best interest hearing, and respondent's counsel did not object.

¶ 30        The trial court reconvened the best interest hearing later that month and remarked that the court and parties had discussed off the record "the process" for presenting the evidence the court had requested. The court then noted that the State had subpoenaed Todd Smith to present that evidence. However, the State did not want to call Todd Smith because the State did not consider him a State's witness. The parties and the court additionally discussed whether the court should call Todd Smith as a court's witness, and the court explained that they resolved (over respondent's objection) to have the GAL call him to testify.

¶ 31        The GAL moved on the record to reopen the evidence and present Todd Smith's testimony. The GAL argued that Todd Smith would provide relevant information that would be helpful to the court. Respondent objected, arguing that (1) the State bore the burden to prove its petition to terminate and (2) the State had already rested its case. Therefore, respondent argued, if the trial court could not reach a decision based on the evidence presented by the State, then the State had not met its burden of proof. The trial court granted the GAL's motion to reopen the evidence.

¶ 32        Todd Smith testified that he talked to St. J. about where St. J. would like to live if respondent and Stephen J.'s parental rights were terminated. St. J. said that he would like to remain with his current foster family and that he was willing to be adopted by them.

¶ 33                                          d. The Trial Court's Decision

¶ 34        After Todd Smith testified, the trial court made an oral ruling, finding that it was in St. J.'s best interest to terminate respondent's parental rights. The court found important that between the February 2017 fitness hearing and the May 2017 best interest hearings, respondent was involved in the incident with Childs. The court reasoned that respondent's behavior indicated that her alcohol abuse was very deep-rooted and difficult for her to overcome. The court noted that regardless of whether it decided to terminate respondent's and Stephen J.'s parental rights to St. J., their contact with St. J. would remain essentially the same because the foster family had agreed to allow respondent and Stephen J. to maintain contact with St. J. The court explained that had Todd Smith testified that St. J. did not want to be adopted, the court would

not have terminated respondent's parental rights because "there would have been no need to." The court reasoned that St. J. could have achieved permanency by continuing to live with Dean P.'s family without being adopted by them.

¶ 35    This appeal followed.

## II. ANALYSIS

¶ 37    Respondent appeals, arguing that (1) the trial court violated respondent's right to due process by requesting additional evidence at the best interest hearing after the parties had rested their respective cases and (2) the court's decision to terminate respondent's parental rights to St. J. was against the manifest weight of the evidence. We disagree and affirm.

### A. The Nature of Proceedings To Terminate Parental Rights

¶ 39    Proceedings to terminate parental rights are governed by the Juvenile Court Act (705 ILCS 405/1-1 to 7-1 (West 2016)) and the Adoption Act (750 ILCS 50/1 to 24 (West 2016)). After a child has been adjudicated abused, neglected, or dependent, the State may file a petition to terminate the parents' parental rights to that child. 705 ILCS 405/2-29 (West 2016).

¶ 40    The State bears the burden of proof in proceedings to terminate parental rights, which contains two portions. First, at the fitness portion of the termination hearing, the State must prove by clear and convincing evidence that the respondent-parent is "unfit" under one or more of the grounds provided by section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2016); 705 ILCS 405/2-29(2), (4) (West 2016)).

¶ 41    Then, at the best interest portion of the termination hearing, the State must prove by a preponderance of the evidence that it is in the minor's best interest to terminate parental rights and make the minor a ward of the court. *In re D.T.*, 212 Ill. 2d 347, 366, 818 N.E.2d 1214, 1228 (2004). At the best interest hearing, the formal rules of evidence do not apply. *In re Jay. H.*, 395 Ill. App. 3d 1063, 1069-70, 918 N.E.2d 284, 289 (2009). Instead "all evidence helpful (in the trial court's judgment) in determining the questions before the court may be admitted and may be relied upon to the extent of its probative value." *Id.* at 1070, 918 N.E.2d at 289. "[C]ases under the Juvenile Court Act are *sui generis*." *Id.*

¶ 42    In *Jay. H.*, this court explained that a best interest hearing under the Adoption Act is the "structural equivalent" of a dispositional hearing under the Juvenile Court Act. *Id.* at 1069, 918 N.E.2d at 289. The purpose of both proceedings is to reach the resolution that is in the best interest of the child. *Id.* at 1070, 918 N.E.2d at 290. In addition, the Adoption Act explicitly provides that it should be construed in concert with the Juvenile Court Act. 750 ILCS 50/2.1 (West 2016). Thus, we look to the Juvenile Court Act for guidance about how evidence should be received at a best interest hearing under the Adoption Act.

¶ 43    Section 1-2(2) of the Juvenile Court Act, which addresses the purpose and policy of that Act, provides the following:

> "In all proceedings under this Act the court may direct the course thereof so as promptly to ascertain the jurisdictional facts and fully to gather information bearing upon the current condition and future welfare of persons subject to this Act. This Act shall be administered in a spirit of humane concern, not only for the rights of the parties, but also for the fears and the limits of understanding of all who appear before the court." 705 ILCS 405/1-2(2) (West 2016).

¶ 44    Section 2-22(4) of the Juvenile Court Act provides further that at a dispositional hearing, the trial court may do the following:

> "On its own motion ***, the court may adjourn the hearing for a reasonable period to receive reports or other evidence, if the adjournment is consistent with the health, safety[,] and best interests of the minor, but in no event shall continuances be granted so that the dispositional hearing occurs more than 6 months after the initial removal of a minor from his or her home." 705 ILCS 405/2-22(4) (West 2016).

¶ 45    "The overriding purpose of the Juvenile Court Act is to ensure that the best interests of the minor, the minor's family, and the community are served." *In re J.J.*, 142 Ill. 2d 1, 8, 566 N.E.2d 1345, 1349 (1991). The court and the State are bound to act in furtherance with that purpose. *Id.*

¶ 46                    B. Trial Courts' Authority to Reopen the Proofs, Generally

¶ 47    A trial court has discretion to allow a party—including the State—to reopen its case to provide additional proof. *People v. Kuntz*, 239 Ill. App. 3d 587, 591, 607 N.E.2d 313, 316 (1993). When deciding whether to grant a motion to reopen the proofs, a court should consider the following factors:

> "(1) whether the failure to introduce evidence occurred because of inadvertence; (2) surprise or unfair prejudice to the adverse party; (3) the importance of the new evidence to the movant's case; and (4) whether cogent reasons exist to justify denying the request." *People v. Ruppel*, 303 Ill. App. 3d 885, 894, 708 N.E.2d 824, 831 (1999).

¶ 48    "[W]hile motions to reopen are usually made by one of the parties, the court may take such action on its own motion where a sound basis for the action appears in the record." *Kuntz*, 239 Ill. App. 3d at 592, 607 N.E.2d at 316. "[I]t is generally never improper for a judge to aid in bringing out the truth in a fair and impartial manner, although no inflexible rule can be applied in such matters." *Id.* at 591, 607 N.E.2d at 316. Nevertheless, "[t]he discretion of the trial judge is not unlimited." *Id.* at 592, 607 N.E.2d at 316. A trial court errs by directing the State to reopen its case if the court "abandons his role as judge and assumes the role of advocate for the prosecution." *Ruppel*, 303 Ill. App. 3d at 894, 708 N.E.2d at 831.

¶ 49    In *Kuntz*, the defendant filed a petition to rescind the summary suspension of his driver's license. At the hearing on defendant's petition, and after the close of evidence, the defendant argued that the State had failed to provide evidence that the Breathalyzer machine relied on was accurate. The State did not move to reopen the case and stated that it had no further evidence. The trial court then granted a continuance for the State to provide additional evidence on the accuracy of the Breathalyzer machine at issue. The *Kuntz* court held that the trial court abused its discretion by *sua sponte* reopening the proofs. In reaching that decision, the court noted that absent the additional evidence, the defense would have succeeded on its petition to rescind the summary suspension.

¶ 50    In *In re Tyreke H.*, 2017 IL App (1st) 170406, the State filed a petition for adjudication of wardship, alleging that the minor respondent had possessed a firearm illegally. *Id.* ¶ 5. At a hearing on the respondent's motion to suppress the firearm, the trial court granted the motion to suppress, finding that the police lacked sufficient suspicion to search the respondent. *Id.* ¶ 15. After the State filed a motion to reconsider, the trial court stated that it would like to view the size of the firearm and the pants the respondent was wearing to determine whether police

could have identified the firearm as such when it was located inside the respondent's pants. *Id.* ¶ 16. After considering that evidence, the trial court granted the State's motion to reconsider. *Id.* ¶ 18.

¶ 51 On appeal, the respondent argued that the trial court abused its discretion by *sua sponte* reopening the proofs and ordering the respondent to produce the firearm and pants. *Id.* ¶ 106. The *Tyreke H.* court determined that the trial court had not become an advocate for the State by reopening the proofs. The appellate court reasoned that when the trial court ordered the proofs reopened, the "additional evidence could have cut either way." *Id.* ¶ 115. Therefore, the trial court was "on a mission to uncover the truth" and not to advocate for a particular party. *Id.* As a result, the *Tyreke H.* court held that the trial court did not abuse its discretion.

¶ 52 C. The Trial Court's Request for Additional Evidence in This Case

¶ 53 In this case, after all parties had rested their cases, the trial court stated that it wanted to hear additional testimony from therapist Todd Smith. Specifically, the court wanted the therapist to testify about whether St. J. had told him that he wanted to be adopted by his foster family. The court did not direct any particular party to present this evidence. The court merely expressed its desire to hear additional testimony from Todd Smith and then continued the hearing until a later date when the parties were available. When the best interest portion of the termination hearing resumed, the GAL called the therapist, who testified about St. J.'s adoption preferences. Respondent argues that the trial court's actions violated her right to due process. We disagree.

¶ 54 In the context of proceedings to terminate parental rights, due process is achieved by compliance with the provisions of the Juvenile Court Act and fundamental fairness. *In re O.S.*, 364 Ill. App. 3d 628, 638, 848 N.E.2d 130, 138 (2006). In this case, the trial court's request for more evidence complied with the goals of the Juvenile Court Act and the Adoption Act "to ensure that the best interests of the minor, the minor's family, and the community are served." *J.J.*, 142 Ill. 2d at 8, 566 N.E.2d at 1349. In this case, Smith's additional testimony was clearly admissible because at both a dispositional hearing and a best interest hearing, the court may consider "all evidence helpful (in the trial court's judgment) in determining the questions before the court may be admitted and may be relied upon to the extent of its probative value." *Jay. H.*, 395 Ill. App. 3d at 1070, 918 N.E.2d at 289.

¶ 55 We conclude that the trial court's reopening of the proofs did not violate respondent's right to due process. The Juvenile Court Act explicitly allows the court "on its own motion" to continue a dispositional hearing so that more evidence can be presented. 705 ILCS 405/2-22(4) (West 2016). In addition, the Juvenile Court Act provides that "the court may direct the course" of proceedings "to ascertain the jurisdictional facts and fully to gather information bearing upon the current condition and future welfare of persons subject to this Act." 705 ILCS 405/1-2(2) (West 2016). As we explained earlier, a best interest hearing is the "structural equivalent" of a dispositional hearing (*Jay. H.*, 395 Ill. App. 3d at 1069, 918 N.E.2d at 289), and the Adoption Act should be construed in concert with the Juvenile Court Act. For those reasons, we conclude that the trial court was within its authority to request additional evidence that would aid the court in determining whether termination of respondent's parental rights was in St. J.'s best interest.

¶ 56 In addition, the trial court did not abandon its role as judge or assume the role of an advocate. The court did not direct any particular party to call Smith, and the court did not know

- 8 -

what the testimony of Smith would reveal. Like in *Tyreke H.*, the requested evidence could have cut either way. The court's motivation in reopening the proofs was not for a particular party to prevail but instead to determine what resolution was in the best interest of St. J. The court therefore did not abuse its discretion by reopening the proofs.

¶ 57                              D. The Trial Court's Best Interest Determination

¶ 58        Respondent argues that the trial court's decision that it was in St. J.'s best interest to terminate parental rights was against the manifest weight of the evidence. We disagree.

¶ 59        At the best interest stage of parental termination proceedings, the State bears the burden of proving by a preponderance of the evidence that termination of parental rights is in the child's best interest. *Jay. H.*, 395 Ill. App. 3d at 1071, 918 N.E.2d at 290-91. Consequently, at the best interest stage of termination proceedings, " 'the parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life.' [Citation.]" *In re T.A.*, 359 Ill. App. 3d 953, 959, 835 N.E.2d 908, 912 (2005).

¶ 60        When reaching a best interest determination, a court shall consider the following factors in the context of the child's age and developmental needs:

"(a) the physical safety and welfare of the child ***;

(b) the development of the child's identity;

(c) the child's background and ties ***;

(d) the child's sense of attachments ***;

* * *

(e) the child's wishes and long-term goals;

(f) the child's community ties ***;

(g) the child's need for permanence ***;

(h) the uniqueness of every family and child;

(i) the risks attendant to entering and being in substitute care; and

(j) the preferences of the persons available to care for the child." 705 ILCS 405/1-3(4.05) (West 2016).

¶ 61        "We will not reverse the trial court's best-interest determination unless it was against the manifest weight of the evidence." *Jay. H.*, 395 Ill. App. 3d at 1071, 918 N.E.2d at 291. A best interest determination is against the manifest weight of the evidence only if the facts clearly demonstrate that the court should have reached the opposite result. *Id.*

¶ 62        In this case, the trial court considered respondent's consistent pattern of abusing alcohol and exposing her children to domestic violence. Despite the counseling and services respondent participated in, she did not resolve those issues. The court determined that St. J.'s need for permanence could not be met by respondent, whose issues with alcohol and domestic violence continued, even after she was found unfit to parent. The court concluded, reasonably, that respondent's behavior indicated that St. J. could not return to respondent's care in the near future. The court weighed those considerations against St. J.'s preference to live with respondent. The court noted St. J.'s preference, but determined that termination of respondent's parental rights was nonetheless in St. J.'s best interest. Dean P.'s testimony that he intended to adopt St. J. only added to the permanence that Dean P.'s family could provide him. Todd Smith's testimony that St. J. would be open to adoption if the court terminated

respondent's parental rights reinforced the court's decision that Dean P.'s family could provide stability and permanence for St. J.

¶ 63 The trial court's decision that it was in St. J.'s best interest to terminate respondent's parental rights was not against the manifest weight of the evidence.

¶ 64                                          III. CONCLUSION

¶ 65 For the foregoing reasons, we affirm the trial court's judgment.

¶ 66 Affirmed.